**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| TRUSTCASH HOLDINGS, INC., | : | |
| DYLAN CALLUM, | : | |
| TYEE CAPITAL CONSULTANTS, INC., | : | **OPINION** |
| JILL CARASQUERO, and | : | |
| KENT CARASQUERO, | : | Civ. No. 08-5284 (WHW) |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| GREGORY MOSS and | : | |
| AYUDA FUNDING CORP., | : | |
| | : | |
| Defendants. | : | |

**Walls, Senior District Judge**

Plaintiffs, Trustcash Holdings, Inc., Dylan Callum, Tyee Capital Consultants, Inc., Jill Carasquero and Kent Carasquero, allege in their Second Amended Complaint ("Complaint") that Defendants, Gregory Moss ("Moss") and Ayuda Funding Corp. ("Ayuda"), violated certain provisions of the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act"). Ayuda moves pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the claims in the Complaint asserted against it.[1] Plaintiffs oppose the motion. The parties appeared before the Court for oral argument. The Court grants Ayuda's motion and dismisses with prejudice the claims in the Complaint asserted against Ayuda.

---

[1] Defendant Moss was administratively terminated from this action on February 25, 2009 because of his bankruptcy filing in the Southern District of New York.

FOR PUBLICATION

## FACTS AND PROCEDURAL BACKGROUND

Plaintiff Trustcash Holdings, Inc. ("Trustcash" or the "Company") is a publicly traded company that offers an online payment system for use in Internet transactions. Plaintiff Kent Carasquero ("Carasquero") is the CEO of Trustcash and a director of the Company. He is also the beneficial owner of a substantial amount of Trustcash common stock. The other named plaintiffs are current shareholders of Trustcash.

Defendant Gregory Moss ("Moss") is a former Trustcash CEO and member of the Company's Board of Directors. Defendant Ayuda is a financial advisory firm and independent lender whose business includes offering personal loans collateralized by the pledge of publicly-traded securities.

Moss became CEO of Trustcash June 30, 2007. Plaintiffs allege that, as of July 17, 2007, he was the beneficial owner of 16,913,959 shares of Trustcash common stock, amounting to 21.8 percent of all outstanding shares. (Compl. ¶ 15.) On February 12, 2008, Moss was removed involuntarily as the CEO. On March 27, 2008, he voluntarily resigned as a director of the Company.

Plaintiffs allege that, sometime before February 19, 2008, Moss received a loan from Ayuda that was collateralized by shares of Trustcash common stock. (Compl. ¶ 23.) Plaintiffs allege that Moss then defaulted on the loan, providing Ayuda, a secured party with a secured interest in the collateralized shares, the right to take beneficial ownership of those shares. (Compl. ¶ 23.) Plaintiffs claim that, pursuant to Moss's default, on February 19, 2008, Signature Stock Transfer, Inc. ("Signature"), Trustcash's appointed stock transfer agent, processed the

FOR PUBLICATION

cancellation of a share certificate owned by Moss representing 15,587,745 Trustcash common

stock shares.  (Compl. ¶ 22.)  Signature issued in replacement (i) Share Certificate No. 1082 to

Moss, representing 13,837,745 common stock shares, and (ii) Share Certificate No. 1081 to

Ayuda, representing 1,750,000 common stock shares.  (Compl. ¶ 22.)

Plaintiffs allege that Ayuda then sold the shares in the market, flooding the market

with Trustcash common stock shares and resulting in a "severe devaluation" of Trustcash

common stock.  (Compl. ¶ 27.)  Plaintiffs also allege that Ayuda engaged in "short-selling" at

least some of the shares by selling them before Moss had defaulted on his loan and delivering

them after acquiring them upon Moss's default.  (Compl. ¶ 32.)  Plaintiffs allege that, on

March 18, 2008, the process was repeated:  Signature cancelled a different stock certificate

owned by Moss and re-issued 7 million of those shares to Ayuda, again as collateral for a

recourse loan upon which Moss defaulted.  (Compl. ¶ 31.)

Plaintiffs allege that the recourse loans were actually "shams" constituting a

scheme by Defendants to evade the Securities Act's registration requirements and selling

limitations.  (Compl. ¶ 4.)  Plaintiffs explain that Moss could not sell a significant percentage of

his Trustcash common stock shares directly into the public market in winter 2008 because he was

an "affiliate" of the Company under SEC Rule 144.  See 17 C.F.R. § 230.144(a)(1) ("An affiliate

of an issuer is a person that directly, or indirectly through one or more intermediaries, controls, or

is controlled by, or is under common control with, such issuer.").  As an affiliate, Moss was

restricted by Rule 144 from selling, within a three-month period, a greater number of securities

than both (i) one percent of the shares of that class outstanding as shown by the most recent

FOR PUBLICATION

report of the issuer, and (ii) the average weekly reported volume of trading in those securities (per designated reporting systems).  17 C.F.R. § 230.144(e)(1).  Plaintiffs allege that Moss transferred his shares to Ayuda so that Ayuda, a non-affiliate of the issuer, could distribute Moss's securities in the public market unconstrained by volume limitations.

        Plaintiffs contend that Moss did not transfer his Trustcash common stock shares directly to Ayuda because then Ayuda would have been subject to a six-month holding period before Ayuda would have been able to resell those shares.  See 17 C.F.R. § 230.144(d)(1) ( "a minimum of six months must elapse between the later of the date of the acquisition of the securities from the issuer, or from an affiliate of the issuer . . ." );  T. Hazen, Law of Securities Regulation § 4.27[3] (6th ed. 2009) (noting that the six-month holding period helps establish that a seller's original intent when acquiring the securities was for investment purposes rather than with an eye towards distribution).  Plaintiffs say that, to circumvent the holding period, Moss pledged his common stock shares to Ayuda in a sham recourse loan that Moss never intended to repay.  Plaintiffs claim that the only purpose of the loan was to allow Ayuda to tack on Moss's time period of ownership of the Trustcash common stock shares to its own, enabling Ayuda to distribute the shares immediately.  See 17 C.F.R. § 230.144(d)(3)(iv) (providing that, if a lender makes a recourse loan collateralized by a bona-fide pledge of a security, then the lender's acquisition of that security upon the borrower's default is deemed for holding period purposes to have occurred at the time that the pledgor originally acquired it).   Plaintiffs allege that Ayuda did not have the requisite investment intent when it acquired the shares and that Defendants are not protected by the Rule 144 safe harbor.

FOR PUBLICATION

Plaintiffs sued Defendants on October 27, 2008, claiming that Defendants violated Sections 5(a), 5(c), and 17(a) of the Securities Act, Sections 10(b) and 13(d) of the Exchange Act, and Exchange Act Rule 10b-5.  In their Second Amended Complaint, Plaintiffs further charge that Defendants violated Sections 12(a)(1) and (2) of the Securities Act.  Plaintiffs ask the Court to (1) enjoin Defendants from (a) distributing any more unregistered shares of Trustcash common stock into the public markets, (b) releasing the restrictive legends on certain shares currently owned by Moss, and (c) committing the securities violations alleged in the Complaint; (2) "find" that Defendants have committed the alleged violations;[2] (3) order Defendants to pay monetary damages to Plaintiffs; and (4) order Defendants to disgorge their alleged ill-gotten gains.

## STANDARD OF REVIEW

On a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the court is required to "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297, 306 (3d Cir. 2007).  However, "a pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'  To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

---

[2]       Plaintiffs assert that this request for a "finding" constitutes a request for a declaratory judgment.  (Pl. Opp. at 11.)  Defendant disagrees, asserting that "[n]owhere in the Complaint is there a claim for declaratory judgment."  (Def. Reply Br. at 7.)

FOR PUBLICATION

relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell

Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 557 (2007)).  "Once a claim has been stated

adequately, it may be supported by showing any set of facts consistent with the allegations in the

complaint."  Twombly at 546.  Thus, "a district court weighing a motion to dismiss asks 'not

whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to

support the claims.'"  Twombly at 563 n.8 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236

(1974)).

## DISCUSSION

I.      **First Claim for Relief:  Section 12(a) claims**

Section 12(a)(1) of the Securities Act creates a private right of action against

parties who offer or sell unregistered securities in violation of Section 5 of the Securities Act.

Section 12(a)(1) provides in part:  "Any person who – offers or sells a security in violation of

section 5 . . . shall be liable . . . to the person purchasing such security from him, who may sue

either at law or in equity . . . to recover the consideration paid for such security . . . ."  15 U.S.C.

§ 77l(1).

Section 12(a)(2) of the Securities Act creates a private cause of action against

parties who offer or sell securities using a prospectus or oral communication containing material

misrepresentations or omissions.  This section provides in part:  "Any person who – offers or

sells a security . . . by means of a prospectus or oral communication, which includes an untrue

statement of a material fact or omits to state a material fact . . . shall be liable . . . to the person

**FOR PUBLICATION**

purchasing such security from him, who may sue either at law or in equity . . . to recover the

consideration paid for such security . . . ."  15 U.S.C. § 771(2).

Sections 12(a)(1) and Sections 12(a)(2) of the Securities Act "use identical

language to indicate . . . the persons who may sue ('the person purchasing such a security from

him')."  Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 635 (3d Cir. 1989) (quoting 15 U.S.C.

§ 771(1)-(2)).  Under either section, only a purchaser of the unregistered security may sue.  See

also Pinter v. Dahl, 486 U.S. 622, 644 (1988) ("The purchase requirement clearly confines § 12

liability to those situations in which a sale has taken place.  Thus, a prospective buyer has no

recourse against a person who touts unregistered securities to him if he does not purchase the

securities.").

Defendants argue that Plaintiffs' First Claim for Relief must be dismissed because

there is no private right of action under Section 12 for non-purchasers.  Plaintiffs do not argue

that they are purchasers of the unregistered securities at issue.  Nonetheless, Plaintiffs argue that

they have a private right of action under Section 12 to seek injunctive relief.  They contend that

"an application of the private right of action here will not lead to duplicative liabilities nor would

it render other provisions of the Act superfluous and, more importantly, the concern over

vexatious litigation and mounting costly securities defenses, by allowing an issuing corporation

to seek redress for its shareholders, would not be present."  (Pl. Opp. at 21-22.)  Plaintiffs do not

point to or advance any case law supporting their argument that a non-purchaser may bring a

private right of action under Section 12.

FOR PUBLICATION

The Court finds that a non-purchaser does not have standing to bring a private cause of action seeking injunctive relief for a Section 12 violation.  Plaintiffs' attempt to bring a private right of action under Section 12 is contravened by the plain language of Section 12, which provides that only purchasers may bring Section 12 claims.  See also Pinter, 486 U.S. at 644 ("The purchase requirement clearly confines § 12 liability to those situations in which a sale has taken place.").  Plaintiffs do not point to any judicial authority for a contrary finding.

The Court grants Defendant's motion to dismiss with prejudice the Plaintiffs' First Claim for Relief.

## II.     Second Claim for Relief:  Section 17(a)(1) claims

Section 17(a) of the Securities Act proscribes fraud in the offer and sale of securities.  Although the Third Circuit has not definitively ruled on whether there is a private right of action under Section 17(a), the "clear majority" of district courts in the Third Circuit have found that an implied private right of action under § 17(a) does not exist.  In re Bexar County Health Facility Dev. Corp. Sec. Litig., 125 F.R.D. 625, 635 (E.D. Pa. 1989).  Importantly, "although at one time a number of circuit courts recognized the existence of an implied civil remedy under section 17(a), the recent trend among circuits is unequivocally against implying a private cause of action under section 17(a)."  David M. Brodsky and Daniel J. Kramer, Federal Securities Litigation § 5-1 n.1 (1997).  As example, in Finkel v. Stratton Corp., 962 F.2d 169 (2d Cir. 1992), a Second Circuit panel reversed an earlier holding and held that a private right of action does not exist under § 17(a).  Similarly, the Fourth, Fifth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits have also held that no private right of action exists under § 17(a).  See

**FOR PUBLICATION**

Finkel, 962 F.2d at 175 (listing cases).  This Court has not found (and Plaintiffs have not cited) any circuit court holding that a non-purchaser of a security has the right to bring a private cause of action under Section 17(a).

Plaintiffs ask the Court to find that, in this instance, an implied private right of action is appropriate under the four-part test articulated by the United States Supreme Court in Cort v. Ash, 422 U.S. 66 (1975).  The Cort test requires that courts should look at the following factors to determine if Congress intended to imply a private right of action in a statute: (1) whether a plaintiff belongs to a class for whose benefit the statute was enacted: (2) whether there is any indication that Congress intended to create a private right of action under the statute, (3) whether implying a private right of action is consistent with the underlying purposes of the legislative scheme, and (4) whether the cause of action is one traditionally relegated to state law such that it is inappropriate to infer a cause of action based solely on federal law.  Cort, 422 U.S. at 78.

Plaintiffs argue that implying a private right of action under Section 17(a) in the action at bar is consistent with the underlying purpose of the legislative scheme.  Plaintiffs contend that courts have generally not found a private right of action implied under § 17(a) because that would turn § 17(a) into "the preferable remedy, rendering §§ 11 and 12 entirely superfluous.  The complex scheme which Congress wove in the express civil liabilities sections would be totally undermined."  (Pl. Opp. at 21 (quoting Kimmel v. Peterson, 565 F. Supp. 476, 487 (E.D. Pa. 1983).)  Plaintiffs note that, here, they are only seeking injunctive relief under § 12, whereas they are seeking monetary damages under § 17(a).  They argue that, as a result,

FOR PUBLICATION

"application of the private right of action will not lead to duplicative liabilities nor would it render other provisions of the Act superfluous and, more importantly, the concern over vexatious litigation and mounting costly securities defenses, by allowing an issuing corporation to seek redress for its shareholders, would not be present."  (Pl. Opp. at 21-22.)

The Court finds that there is no implied private right of action under Section 17(a) for a non-purchaser of the security at issue.  In so holding, the Court follows the almost universal trend among circuit courts and the majority of courts in this district.  Bexar, 125 F.R.D. at 635.

Additionally, the Court is unimpressed by Plaintiffs' policy argument.  The reason that Plaintiffs cannot seek monetary damages under § 12 is because they are not "purchasers" of the securities at issue.  Plaintiffs essentially argue that, in this context, standing to bring a Section 17(a) claim should be more widely granted to non-purchasers than purchasers.  This result would be inconsistent with the underlying scheme of the securities laws that typically makes it more difficult for non-purchasers to pursue private causes of action than purchasers.  The Court does not find merit in Plaintiff's argument that the reverse should be so for alleged Section 17 violations.

The Court grants Defendant's motion to dismiss with prejudice the Second Claim for Relief.

**III.   Third Claim for Relief: Section 17(a)(2) and (3) claims**

Plaintiffs allege that Defendants violated § 17(a)(2) and (3) of the Securities Act. As discussed, no private right of action exists under Section 17(a) of the Securities Act for non-purchasers of the securities at issue.

-10-

FOR PUBLICATION

The Court grants Defendant's motion to dismiss with prejudice the Third Claim for Relief.

**IV.     Fourth Claim for Relief: Section 10(b) claims**

*A.     Legal Standard*

Section 10(b) of the Exchange Act prohibits the use of fraudulent schemes or devices in connection with the purchase or sale of securities.  Under Section 10(b), it is unlawful to "employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention" of any rule promulgated by the SEC designed to protect the investing public.  15 U.S.C. § 78j(b).

To implement the statute, the SEC enacted Rule 10b-5.  The majority of securities fraud actions are brought pursuant to Rule 10b-5(b), which deems it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5.  To prevail on a Rule 10b-5(b) claim, plaintiffs must show that a defendant made (1) a misstatement or an omission of a material fact (2) with scienter (3) in connection with the purchase or sale of a security (4) upon which plaintiffs relied, and (5) that the plaintiffs' reliance proximately caused their injury.  Kline v. First W. Gov't Sec., Inc., 24 F.3d 480, 487 (3d Cir. 1994).  Claims may also be brought under the more general provisions of Rule 10b-5(a) and (c), which prohibit the use of "any device, scheme, or artifice to defraud" and the participation "in any act, practice, or course of business" that would perpetrate fraud on investors.  17 C.F.R. § 240.10b-5(a), (c).

-11-

FOR PUBLICATION

    B.    *Analysis*

        1. Implied Right of Action

        Violations of Rule 10b-5 give rise to a private cause of action.  See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975).  In Blue Chip, the United States Supreme Court affirmed the "Purchaser-Seller" rule, initially advanced by the Second Circuit in Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir. 1952), and held that standing to bring a private cause of action for money damages under Rule 10b-5 is limited to actual purchasers or sellers of securities.  Blue Chip, 421 U.S. at 755 (1975).

        Before Blue Chip, the Third Circuit had carved out an "injunction exception" to the Purchaser-Seller rule of Birnbaum and held that a non-purchasing or non-selling plaintiff has standing to request injunctive relief for a 10b-5 violation.  Kahan v. Rosenstiel, 424 F.2d 161, 173 (3d Cir. 1970).  Two post-Blue Chip Third Circuit decisions have discussed in dicta and conveyed opposing views as to whether the Kahan injunction exception survives Blue Chip. Compare Tully v. Mott Supermarkets, Inc., 540 F.2d 187, 194 (3d Cir. 1976) (stating that the "relaxed standing rule of Kahan retains its validity after Blue Chip Stamps in appropriate cases where only incipient relief is sought to prevent incipient 10b-5 violations"), with Sharp v. Coopers & Lybrand, 649 F.2d 175, 187 (3d Cir. 1981) (stating that "the 'purchaser-seller' rule of Blue Chip Stamps would now preclude the Kahan suit").  The Third Circuit has not explicitly resolved whether the exception remains good law in this Circuit.  See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 486 (3d Cir. 1998) ("[W]e have yet to decide whether a non-purchasing or non-selling plaintiff continues to have standing to seek injunctive

-12-

FOR PUBLICATION

relief for an alleged 10b-5 violation after <u>Blue Chip Stamps</u>.  However, resolution of that

question must await yet another day as we need not now decide it to resolve the case at bar.").

The Third Circuit has stated unequivocally in a decision rendered after <u>Trump</u>, albeit in the

context of a plaintiff seeking monetary damages, that the "plaintiff class under Rule 10b-5 is

limited exclusively to actual sellers or purchasers of securities.  There is no private right of action

under Rule 10b-5 for mere holders of securities."  <u>The Winer Family Trust v. Queen</u>, 503 F.3d

319, 325 (3d Cir. 2007) (citing <u>Blue Chip</u>).

      Plaintiffs argue that this Court should follow the approach taken by the New

Jersey district court in <u>Foster Wheeler Corp. v. Edelman</u>, No. 87-cv-4346, 1987 U.S. Dist.

LEXIS 16783 (D.N.J. Dec. 9, 1987) and find that the <u>Kahan</u> "injunction exception" survives

<u>Blue Chip</u> and remains good law.  (Opp. at 6).  <u>See</u> <u>Foster Wheeler</u> at *11-12 (holding that the

injunction exception is still the law in this Circuit and should be followed "unless and until the

Third Circuit rules otherwise").  Plaintiffs also argue that they should be allowed to obtain

monetary damages and that Defendants should be forced to disgorge their ill-gotten gains

because the "facts of the case and policy justifications support disgorgement as within the

remedies and purview of the Federal securities laws."  (Pl. Opp. at 13.)

      Defendant counters that reliance on <u>Foster Wheeler</u> is misplaced because the

Third Circuit explicitly stated in <u>Trump</u> (decided after <u>Foster Wheeler</u>) that the Third Circuit has

not yet resolved whether the injunction exception survives <u>Blue Chip</u>.  (Def. Reply Br. at 2-3.)

Defendants further argue that, even if an injunction exception exists, Plaintiffs' request for

monetary damages must be dismissed under the Purchaser-Seller rule.  (Def. Reply Br. at 3.)

FOR PUBLICATION

As an initial matter, this Court finds that Plaintiffs' requests for monetary damages and disgorgement must be dismissed.  The United States Supreme Court has plainly held that a non-purchasing and non-selling plaintiff does not have standing to seek monetary damages under Rule 10b-5.  Blue Chip, 721 U.S. at 455.  See also Winer Family Trust, 503 F.3d at 325 (holding that the plaintiff "must be a purchaser or seller to pursue its Rule 10b-5 claims").  Even if this Court were to find that an injunction exception to the Blue Chip rule exists, Plaintiffs cannot tack on a claim for monetary damages to their claim for injunctive relief.

This Court also finds that, even if Plaintiffs have stated in their Complaint a request for a declaratory judgment, that request must be denied for lack of standing.[3]  The Third Circuit has refused to recognize the standing of a non-purchasing and non-selling plaintiff to seek a declaratory judgment under Rule 10b-5 when the alleged violations were "completed some time before the suit was filed and so the preventative aspects of an action to enjoin continuing violations which [the Third Circuit] found sufficient to relax the Birnbaum rule in [Kahan] are not present."  Thomas v. Duralite Co., Inc., 524 F.2d 577, 590 (3d Cir. 1975).  Because Plaintiffs request a declaratory judgment that Defendants committed past violations, the request is denied.

Lastly, the Court considers Plaintiffs request for injunctive relief.  Plaintiffs ask the Court to enjoin Defendants from (a) continuing to distribute unregistered shares of Trustcash common stock into the public market, (b) releasing the restrictive legends on Moss's stock, and (c) committing future violations of the federal securities laws.  (Compl ¶¶ 6-8.)

_____

[3]  As discussed, Plaintiffs and Defendant disagree as to whether Plaintiffs' request that the Court "find" that Defendants committed the alleged violations constitutes a request for a declaratory judgment.

-14-

**FOR PUBLICATION**

As discussed and to resay, the Third Circuit has not explicitly resolved whether an injunction exception survives <u>Blue Chip</u> in this Circuit.  <u>Trump</u>, 140 F.3d at 486 ("[W]e have yet to decide whether a non-purchasing or non-selling plaintiff continues to have standing to seek injunctive relief for an alleged 10b-5 violation after <u>Blue Chip Stamps</u>.  However, resolution of that question must await yet another day as we need not now decide it to resolve the case at bar.").  Absent a more explicit directive from the Third Circuit, this Court will consider the various policy arguments raised by Plaintiffs and Defendant in deciding whether Plaintiffs should be allowed to seek injunctive relief under Rule 10b-5.

Plaintiffs argue, citing a Seton Hall Law Review article, that the Court should apply an injunction exception to the Purchaser-Seller rule because:  (1) injunctive relief does not unjustly enrich plaintiffs and will not lead to vexatious litigation (negating the concerns expressed by the <u>Blue Chip</u> court with allowing a private plaintiff to bring a private right of action under Rule 10b-5 for monetary damages); (2) corporate issuers should have standing to prevent irreparable injury; and (3) corporate issuers are the "best champion of shareholders' rights" because they can take collective action, possess extensive resources, and can prevent overburdening of the SEC.  (Pl. Opp. at 8-9 (citing Eric Chaffe, <u>Beyond Blue Chip: Issuer Standing to Seek Injunctive Relief Under Section 10(b) and Rule 10b-5 Without the Purchase or Sale of a Security</u>, 36 Seton Hall L. Rev. 1135 (2006)).)  Plaintiffs also argue that they are the party best-suited to uncover the Defendants' alleged violations because Defendants did not file mandatory beneficial ownership reports with the SEC, preventing the SEC from discovering the alleged misconduct.  (Pl. Opp. at 10.)

FOR PUBLICATION

Defendants counter that, even in the law review article cited by Plaintiffs, the author recognized "that the Supreme Court itself would not currently allow an injunctive exception for issuers."  (Def. Reply Br. at 5 (citing Chaffe at 1170).)  Defendants argue that courts generally reject the assertion that issuers have police powers in the security markets.  (Def. Reply Br. at 6 (citing Liberty Nat'l Ins. Holding Co. v. The Charter Co., 734 F.2d 545, 555 (11th Cir. 1984).)  Defendants also argue that policy reasons favor not adopting an injunction exception, including fears of  "possible misuse of issuer standing by directors and officers." (Def. Reply Br. at 5 n.6 (citing Chaffe at 1168).)  Defendants note that Plaintiffs fail to acknowledge that other circuit courts have rejected an injunction exception to the Blue Chip rule, including the D.C. Circuit.  See Cowin v. Bresler, 741 F.2d 410, 424 (D.C. Cir. 1984) ( "The relaxed standing rule urged on us by appellant would be contrary to the rationale of section 10(b) and Rule 10b-5 as perceived by the Supreme Court in Blue Chip.").

This Court finds that Defendants have the stronger argument.  Adopting a "flat rule" prohibiting non-sellers and non-buyers from suing under Rule 10b-5 will prevent "case-by-case erosion" of the Purchaser-Seller rule and prevent potential plaintiffs from thwarting the underlying purpose of the Purchaser-Seller rule by creating a potentially unlimited class of potential plaintiffs.  See Cowin, 741 F.2d at 424.  Moreover, Defendants are correct that private parties generally do not have widespread police powers in the security markets.  See,e.g., Liberty Nat'l Ins. Holding Co., 734 F.2d 545 at 559 ("[Plaintiff] argues that, as the issuer concerned with the integrity of the market for its securities, it is best positioned to police section 10(b) and effectuate its purposes.  We cannot agree.").  In addition, the recent judicial trend has been to

-16-

**FOR PUBLICATION**

narrow the private remedies available for parties alleging violations of Section 10(b).  See SEC v.

Lucent Techs., Inc., 610 F. Supp. 2d 342, 353 (D.N.J. 2009) (demonstrating that, in recent cases,

"the Supreme Court has consistently narrowed the class of defendants reachable by the implied

cause of action under Section 10(b)").  Lastly, the Court's holding that Plaintiffs do not have

standing to seek injunctive relief under Rule 10b-5 is consistent with the Third Circuit's recent

admonition (albeit made in the context of a plaintiff seeking monetary damages) that the

"plaintiff class under Rule 10b-5 is limited exclusively to actual sellers or purchasers of

securities.  There is no private right of action under Rule 10b-5 for mere holders of securities."

Winer Family Trust, 503 F.3d at 325.

### 2. Propriety of Injunctive Relief

That said, the Court finds that, even if Plaintiffs had standing to bring a private

right of action for injunctive relief under Rule 10b-5, they have failed to assert any particular

injunctive relief appropriate for the Court to grant.

Plaintiffs request that the Court prevent Moss from releasing the Rule 144

restrictive legends on Share certificate 1100 representing 5,437,745 shares owned by Moss.

(Compl. ¶ 8.)  Plaintiffs do not argue that Moss is currently an affiliate subject to Rule 144's

restrictions.  Rather, Plaintiffs argue that it is "brazen" for Defendants to take the position "that

since Moss's holding period under Rule 144 is now satisfied, Moss and Ayuda are free to dump

the balance of Moss's shares.  Clearly, there is no better indication than that as to the need for

injunctive relief as prayed for by Plaintiffs in the [Complaint]."  (Pl. Opp. at 4.)  Plaintiffs'

argument appears premised on an assumption that if Moss had not engaged in a scheme to

FOR PUBLICATION

distribute his Trustcash stock to the public, he would still be an affiliate by ownership under Rule

144. Plaintiffs imply that the Court should still treat Moss as an affiliate because he obtained his

current non-affiliate status via an allegedly improper scheme.

        To analyze the propriety of Plaintiffs' request, the Court examines Plaintiff's

assumption that Moss would be an affiliate by ownership if he had not engaged in the alleged

scheme to distribute his shares in the market. Under Rule 144, an affiliate is "a person that

directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under

common control with, such issuer." 17 C.F.R. § 230.405. "Control" under this rule is defined as

the "possession, direct or indirect, of the power to direct or cause the direction of the management

and policies of a person, whether through the ownership of voting securities, by contract, or

otherwise." Id. The affiliate inquiry "is based on the totality of the circumstances, 'including an

appraisal of the influence upon management and policies of a corporation by the person involved.'

Affiliates are most often officers, directors, or majority shareholders — people who exercise

control and influence over the company's policies or finances." SEC v. Freiberg, No. 05-cv-233,

2007 U.S. Dist. LEXIS 67900, at *46 (D. Utah Sept. 12, 2007) (quoting United States v. Corr,

543 F.2d 1042, 1050 (2d Cir. 1976)).

        There is "no bright-line rule declaring how much stock ownership constitutes

'control' and makes one an 'affiliate'" under Rule 144. SEC v. Cavanagh, 445 F.3d 105, 114 n.19

(2d Cir. 2006). "Some commentators have suggested that ownership of something between ten

and twenty percent is enough, especially if other factors suggest actual control." Cavanagh, 445

F.3d at 114 n.9 (citing Sidney Ravkind, We New Wizards of Wall Street, 66 Tex. B.J. 120, 126

FOR PUBLICATION

n.32 (2003)).  In Cavanagh, the Second Circuit concluded that two partners in a small business

would be affiliates by ownership because they were "controlling shareholders."  Cavanagh, 445

F.3d at 114.  Each owned nearly one-quarter of the company's stock, as did two other partners,

and they sold their shares as a block.  Id.  Commentators have noted that "it seems likely that the

inquiry about control or of control by a 'small business' will be set [by the SEC in a new rule] in

the 25 percent range.  After all, ownership of 10 percent of General Motors with its gillion

shareholders is different than owning 10 percent of a much smaller entity."  Ravkind at 126.

          The Court finds that Plaintiffs have not alleged any set of facts from which the

Court could reasonably assume that Moss would currently be an affiliate by ownership if he had

not engaged in the alleged scheme with Ayuda.  Trustcash is a publicly traded company.

(Compl. ¶ 18.)  Plaintiffs allege that, at most, Moss owned 20 percent of Trustcash stock at one

time.  He was not a controlling shareholder and, unlike in Cavanagh, where "other factors"

contributed to the Court's finding of affiliate by ownership status, Plaintiffs have not alleged any

"other factors" indicating that Moss asserted any influence or control over Trustcash after his

departure.  He was no longer the CEO or a director of the Company as of March 27, 2008.

Moreover, Moss's twenty percent ownership share, while not insignificant, is below the twenty-

five percent threshold that commentators have suggested should be the trigger for further inquiry

into whether a stockholder qualifies as an affiliate by ownership.  Rivkind at 126.  And, most

importantly, it is now over eighteen months since Moss left Trustcash, and during this time Moss

could have permissibly reduced his stock ownership through other means even if he had not

turned over any shares to Ayuda.  (Even if he were an affiliate, Moss could have reduced his stock

-19-

**FOR PUBLICATION**

ownership through selling the maximum number of shares allowed under Rule 144.)  Because

Plaintiffs have not set forth any set of facts that, if true, would support their assumption that Moss

would currently be an affiliate by ownership if not for the alleged scheme, the Court rejects this

assumption.  Without it, Plaintiffs' request for injunctive relief to prevent Moss from releasing the

legends on his shares must be denied.

      The Court must also deny Plaintiffs' request to enjoin Ayuda because the six-

month holding period that would have applied to any shares that Ayuda acquired from Moss

before Moss's resignation from the Company (if Ayuda was unable to tack on Moss's ownership

period to its own) has expired.  See 17 C.F.R. § 230.144(d)(1) (providing that a non-affiliate

acquiring restricted securities of a company required to file periodic reports under the Exchange

Act is subject to a six-month holding period before reselling the securities to take advantage of the

Rule 144 safe harbor).  Presently, Moss is not an affiliate, and no holding period would apply to

any Trustcash shares that Ayuda would presently acquire from him.  Plaintiffs have failed to raise

any allegations that would, if true, entitle Plaintiffs to injunctive relief vis-a-vis Ayuda.

      Plaintiffs' request for an injunction generally prohibiting Defendants from

violating securities law in the future also must be denied.  To justify an injunction, there must be a

"reasonable likelihood of future violations of securities law."  SEC v. Murphy, 626 F.2d 633, 655

(9th Cir. 1980).  Here, all alleged violations were predicated on Moss's status as an affiliate and

Ayuda's sale of unregistered securities before the holding period expired.  Moss has not been an

affiliate for over eighteen months.  Plaintiffs have not alleged any set of facts that, if true, would

support a conclusion that there is a reasonable likelihood that Moss or Ayuda will commit in the

-20-

 **FOR PUBLICATION**

future the same violations alleged in the Complaint (which were all predicated on Moss's affiliate

status) or any other securities laws violations.  As a result, Plaintiffs' general request for

injunctive relief is denied.

3. <u>Whether Alleged Misconduct Gives Rise to Rule 10b-5 Claim</u>

Although the Court dismisses the Fourth Claim for Relief because Plaintiffs do not

have standing to pursue it, the Court notes that it would dismiss the Complaint even if Plaintiffs

did have standing because the alleged misconduct described in the Complaint does not give rise to

a Rule 10b-5 claim:

The Court notes that Plaintiffs do not point to any misstatement or omission of a

material fact by Defendants.  As a result, Plaintiffs have not plead a set of facts that would entitle

them to relief under Rule 10b-5(b).  <u>See Kline</u>, 24 F.3d at 487 (noting that a misstatement or

omission of a material fact is the first element of a Rule 10b-5(b) claim).

The Court also evaluates whether the alleged scheme, if proved, constitutes an

actionable scheme Rule 10b-5(a) and (c).[4]  The Supreme Court has established that "[c]onduct

itself can be deceptive" and that liability under Rule 10b-5(a) and (c) could be sustained without a

"oral or written statement."  <u>Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.</u>, 552 U.S.

148, 158-59 (2008).  To state a cause of action for scheme liability, "a plaintiff must allege that

defendant (1) committed a manipulative or deceptive act (2) in furtherance of the alleged scheme

to defraud, (3) scienter, (4) and reliance."  <u>In re Royal Dutch/Shell Transp. Sec. Litig.</u>, 380 F.

---

[4]  Although Plaintiffs do not specifically assert that they are making a Rule 10b-5(a) and
(c) claim, such a claim is within the orbit of Plaintiffs' general Rule 10b-5 claim.

-21-

FOR PUBLICATION

Supp. 2d 509, 560 (D.N.J. 2006) (quoting In re Global Crossing, Ltd. Sec. Litig., 322 F. Supp. 2d

319, 336 (S.D.N.Y. 2004)).

        As this Court has noted, "there is no clear Third Circuit precedent on the standard

for scheme liability" under Rule 10b-5(a) and (c). Lucent, 610 F. Supp. 2d at 360. This Court has

attempted to provide some substance to scheme liability's blurry contours. See Lucent, 610 F.

Supp. 2d at 359-60. Most pertinently, this Court has held that the alleged conduct must be

inherently deceptive. See Lucent, 610 F. Supp. 2d at 360 (finding that the alleged scheme was not

"inherently deceptive" because the sales at issue were "legitimate business transactions" and the

only deception was the failure to disclose the "real terms of the deal"). The inherently deceptive

conduct must be employed to deceive investors to give rise to scheme liability. See, e.g., Newby

v. Enron Corp., No. 2006 U.S. Dist. LEXIS 88121, at *22 (S.D. Tex. Dec. 4, 2006).

        The Court finds that the harm allegedly suffered by Plaintiffs was not the result of

inherently deceptive conduct by Plaintiffs. It is undisputed that, if Moss and Ayuda engaged in

bonafide recourse loans pledging Trustcash shares as collateral and Moss then defaulted, Ayuda

could have acquired the shares and resold them immediately to the public. This supports a finding

that Ayuda's distribution of shares to the public was not inherently deceptive or manipulative.

Although Plaintiffs allege that Defendants violated the reporting requirements of the securities

laws before distributing their shares to the public, the alleged deception is a regulatory violation

that Plaintiffs do not have standing to enforce. The Court finds that, even if there was impropriety

in Defendants' activities, the impropriety involved evading the registration requirements and

reselling limitations of the securities laws, and was not an inherent deception perpetrated on

**FOR PUBLICATION**

Trustcash's then-existing shareholders.  See Hazen at § 12.2 ("Establishing a violation of the

disclosure standards set forth in an SEC rule, standing alone, will not give rise to a private remedy

[under section 10(b)]. . . . [A]ny such remedy would have to be implied from the statute rather

than simply from the underlying rules.").  The alleged deception is not sufficiently causally

connected to any inherently unlawful activities propagated on Plaintiffs such that Plaintiffs can

proceed with a Rule 10b-5(a) and (c) claim.[5]

Plaintiffs contend that in a similar case, Stephenson v. Deutsche Bank AG, 282 F.

Supp. 2d 1032 (D. Minn. 2003), involving defendants who "were alleged to have artificially run

up the stock," the court found that a 10(b) case was properly pled.  (Pl. Opp. at 18.)  There, the

plaintiffs alleged that the defendants orchestrated a price to manipulate the price of thinly-traded

securities while the securities were loaned to various broker-dealers including the plaintiffs.

Deutsche Bank, 282 F. Supp. 2d at 1042.  The plaintiffs alleged that, because the securities were

marked to the market, the increase in their market price forced the borrowing broker-dealers to

send hundreds of millions of cash collateral upstream to the architects of the scheme.  Id.

Ultimately, the broker-dealers were left with worthless securities, while the defendants allegedly

---

[5]     The lack of a direct causal connection between the alleged inherently deceptive
conduct and Plaintiffs' alleged injuries can alternatively be framed as a defect in reliance, which
requires a causal connection between a defendant's alleged misconduct and a plaintiff's injury.
See Basic Inc. v. Levinson, 485 U.S. 224, 243 (1988) ("Reliance provides the requisite causal
connection between a defendant's misrepresentation and a plaintiff's injury.").  In addition, the
lack of a causal connection here can be tied into a standing analysis and framed as a basis for
finding that Plaintiffs are not within the zone of protection established by Section 10(b) and Rule
10b-5 regardless of relief sought.  See Trump, 140 F.3d at 486 (finding that the "injuries that [the
plaintiff] alleges here are not within the zone of protection established by § 10(b) and Rule 10b-5
regardless of the relief sought.  Furthermore, [the plaintiff] has not established the prerequisite
nexus between the injuries it claims, and the securities violations that it alleges.").

FOR PUBLICATION

made significant profits.  Id.  The court found that the plaintiffs had sufficiently stated a claim for market manipulation because the elements of a Rule 10b-5 claim were properly pled.  Id. at 1056. In the present matter, Plaintiffs argue that Defendants' alleged "fraudulent and illegal scheme to knowingly dump millions of unregistered shares of Trustcash common stock into the public markets," which allegedly affected the Trustcash common stock price, constitutes a Rule 10b-5 violation similar to the claim found to be properly stated in Deutsche Bank.  (Pl. Opp. at 19.)

The Court does not find Plaintiffs' comparison of this case to Deutsche Bank compelling.  In Deutsche Bank, there was a strong causal connection between the defendants' alleged scheme and the injuries suffered by the plaintiffs, as the broker-dealers had been "brought into the stock loan transactions as conduits or run-throughs."  Id. at 1047.  By contrast, here Plaintiffs were not duped into participating in the allegedly fraudulent scheme, and their claimed losses were only incidental as a result of Trustcash stock decreasing in value as a result of over-saturation in the market.  Moreover, the alleged Rule 10b-5(a) and (c) violation in Deutsche Bank was a claim for market manipulation.  The Supreme Court has described market manipulation as "virtually a term of art when used in connection with securities markets.  The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity."  Santa Fe Indus. v. Green, 430 U.S. 462, 476 (1977) (citation omitted).  Plaintiffs do not allege any similar claim for market manipulation here. The comparative usefulness of Deutsche Bank, where a market manipulation claim was alleged, is particularly limited.

**FOR PUBLICATION**

>    4. <u>Sufficiency of Pleading</u>

The parties disagree as to whether Plaintiffs have met the heightened pleading

requirements of Rule 9(b) of the Federal Rules of Civil Procedure for a Rule 10b-5(b) claim,

including a proper pleading of scienter, economic loss, and loss causation.  As discussed, the

Court dismisses the Fourth Claim for Relief on other grounds.  The Court need not reach the issue

of whether the heightened 9(b) pleading standards are satisfied.

<u>**CONCLUSION**</u>

The Courts grants Defendant's motion to dismiss the claims in the Complaint

asserted against Ayuda.  The First, Second, and Third Claims for Relief are dismissed because

Plaintiff lacks standing to pursue them, as Sections 12 and 17(a) of the Securities Act do not give

a non-purchaser the right to bring a private action enforcing those statutes.  The Fourth Claim for

Relief is dismissed because the Court finds that a non-purchaser or non-seller does not have

standing to bring a private action for injunctive relief, the injunctive relief sought by Plaintiffs is

unwarranted, and Plaintiffs have failed to plead facts giving rise to a Rule 10b-5 violation.  The

claims in the Complaint asserted against Ayuda are dismissed with prejudice.


November 12, 2009                              **s/William H. Walls**
                                              United States Senior District Judge


-25-

**FOR PUBLICATION**

**Appearances**

Gregory Bartko, Esq. (admitted *pro hac vice*)
Law Office of Gregory Bartko, LLC
3475 Lenox Road, Suite 400
Atlanta, GA 30326
      -and-
Keith N. Biebelberg
Biebelberg & Martin
Schoolhouse Plaza
374 Millburn Avenue
Millburn, NJ 07041
      Attorneys for Plaintiffs

Brendan M. Schulman, Esq. (admitted *pro hac vice*)
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
      -and-
Lida Dunn Wetre, Esq.
One Newark Center, 19th Floor
Newark, NJ 07102
      Attorneys for Defendant Ayuda Funding Corp.